[No. 27698. Department Two. December 8, 1939.]

Arthur Barfknecht, *Appellant,* v. Shepard Steamship
Company, *Respondent.*[1]

[1]Reported in 99 P. (2d) 387.

644

*Sam L. Levinson* and *Jay Friedman,* for appellant.

*Bogle, Bogle & Gates* and *Claude E. Wakefield,* for respondent.

BEALS, J.—Plaintiff, a seaman, instituted this action on his own behalf and as assignee of seven other companion seamen, asking judgment against defendant for wages, subsistence, and transportation from Tacoma to New York, the cause of action being based upon a contract of employment between plaintiff and his assignors, on the one part, and defendant, as owner of the SS "Timber Rush," upon which steamer plaintiff and his assignors shipped as seamen, on the other. In so far as plaintiff and six of his assignors are concerned, the facts are practically identical. The facts in connection with the claim of assignor Walter Anderson differ in some particulars from the others.

Prior to March 10, 1938, defendant had entered into an agreement with the "Sailors Union of the Pacific," hereinafter referred to as the SUP, an organization having its headquarters on the Pacific coast, by the terms of which agreement the SUP was to act as the bargaining agent for the crew of the "Timber Rush" and other vessels owned by defendant. While the contract referred to was still in effect, an election was held under supervision of the national labor relations board, as the result of which election the "National Maritime Union," hereinafter referred to as the NMU, was certified as representing the sailors and employees of defendant. The SUP, however, contended that its contract with defendant was still effective, and should be carried out.

Defendant, contemplating a voyage of its ship "Timber Rush" from the Atlantic coast to points on

the Pacific coast, signed a crew presented by the NMU, in accordance with the ruling of the NLRB. A rider in the following form was attached to and made a part of the shipping articles, which were signed by plaintiff and his assignors before the United States shipping commissioner, at Philadelphia:

"In the event the ship is held up or laid up for any reason for which unlicensed personnel are not responsible, the crew will be given wages, subsistence and first-class transportation back to New York."

It appears that this was the first voyage undertaken by any ship belonging to defendant where the entire unlicensed personnel was employed on the east coast, and consisted exclusively of members of the NMU. On prior voyages, defendant had hired its seamen from both unions.

April 14, 1938, the "Timber Rush" docked at Seattle, where it was met by a large group of SUP members and sympathizers, who established a picket line on the dock. The members of the crew, however, continued without molestation their regular work, and April 16th, the vessel left Seattle for Tacoma, where the balance of the cargo was discharged. On the following day, April 17th, the vessel was fumigated, and the crew necessarily went ashore, returning to the ship either that evening or early the following day. On the morning of April 18th, while the vessel was alongside the dock, the tide being at such a height that it was possible to step from the dock to the ship's main deck, a large number of SUP members or sympathizers, the number being variously estimated at from one hundred to two hundred men, came to the dock, groups of them boarding the ship. Later in the morning, more of these men boarded the ship, and when they departed, twenty or so members of the crew, including six of plaintiff's assignors, went with them.

The members of the crew did not take their gear with them, those who testified on the trial of this action stating that they were removed and carried to Seattle against their will.

One Dennett, an official of the Committee on Industrial Organization, with which the NMU is affiliated, residing in Seattle, consulted with the members of the crew, urging them to return to the ship and undertaking to insure their safe return. Dennett and one Wright, an agent of defendant, arranged to transport the crew back to the vessel, seven of the seamen agreeing to go, and having been taken in a truck from the Arlington hotel in Seattle to the ship, which they boarded. The trip was made on or about April 22d, under police escort, and without difficulty. Two other members of the crew were returned to the ship by Wright a day or so later, and several days after that four more of the seamen were returned under Wright's care, all these trips being made under police escort and without any annoyance. In this manner, thirteen of the twenty members of the crew who had left the ship returned and resumed work.

May 13th, as the result of conferences in the east, the vessel proceeded from Tacoma to Seattle, and upon the vessel's arrival in Seattle, the voyage was canceled and the ship anchored in Lake Union.

The wages due plaintiff and his assignors up to April 22d, the date the first group of the crew returned to the ship, were paid to the United States shipping commissioner, who in turn, as the men had been logged as deserters, turned the money over to the United States district court in Tacoma. May 20th, a hearing was had before that court, which found that the men were not deserters and directed that their wages be paid to them. At the time, the court stated that its determi-

nation of the issue of desertion was not to be considered *res judicata* in any later action.

This suit was instituted for the purpose of recovering wages claimed from April 22d to May 13th, and also to recover wages from May 13th, together with transportation back to New York, and subsistence during the period of travel. The action was tried to the court, sitting without a jury, and resulted in the entry of findings of fact and conclusions of law in defendant's favor, followed by a judgment dismissing the action, from which plaintiff has appealed.

Appellant contends that the court's findings of fact are contrary to the evidence, and that the conclusions are contrary to law.

The findings of fact are voluminous and explicit. The court found the making of the contract as above set forth; the ruling of the NLRB, and the hiring of the crew pursuant thereto; that the voyages of respondent's ships commence on the east coast, and that, for the voyage in question, respondent hired for the "Timber Rush" a crew belonging to the NMU, in accordance with the certificate of the NLRB; that the SUP had disagreed with the ruling of the NLRB, and decided that they had a grievance against respondent, that members of their union should have been hired for the voyage in question, and that, for this reason, when the ship arrived at Seattle, the SUP caused the vessel to be picketed; that the dispute was entirely between the two unions involved, over a jurisdictional matter as to which was the proper union to furnish crews for respondent's vessels, and particularly for the "Timber Rush."

The court then found other facts as above stated, and that, on the morning after the ship was fumigated, a considerable number of the pickets boarded the vessel and forced most of the deck crew to leave; that there

was no fighting, but that the men left under threats or intimidation; that appellant's assignors, with the exception of Walter Anderson, left the vessel with the pickets at this time, but that appellant himself and Anderson left later; that, under instructions from a member of the Tacoma police squad, the captain of the ship talked to one Joseph E. Dunn, a member of the crew, and one of appellant's assignors, who acted as spokesman for the crew, asking him if the men wanted to return to the ship, and that Mr. Dunn replied that the crew did not care to go back on board; that the men were then, by the SUP, taken to Seattle, where they were lodged at the expense of the SUP.

The court further found that appellant himself left the ship on the evening of April 18th, and that assignor Anderson left at nine o'clock the following morning; that both of these men left voluntarily; that Anderson subsequently entered the Marine hospital at Seattle, but that the record contains no evidence that he advised the master of his intention to seek hospitalization, or that he, until after May 13th, ever told the master that he had been in the hospital; that a total of thirteen members of the crew returned to the ship and performed their duties, and that these men were not in any way molested or caused any inconvenience or difficulty whatsoever.

Findings Nos. 8 and 9 read as follows:

"(8) That the plaintiff and plaintiff's assignors at all times refused to return to the ship and refused to avail themselves of the arrangements made by the defendant for their return to the vessel; that the said seven (7) men, plaintiff and plaintiff's assignors herein, who failed and refused to return to the ship were also urged by their union representative, Mr. Eugene Victor Dennett, to return to the vessel, but they still refused to do so.

"(9) That the S. S. TIMBER RUSH remained at Ta-

coma until the early morning of May 13, 1938, during which time the members of the crew who returned to the vessel worked upon said vessel and encountered no trouble or difficulty whatsoever, that no attempt was made to load cargo on said vessel after approximately April 26, 1938, that the longshoremen refused at all times subsequent to April 18, 1938, to load said vessel; that at said time said vessel sailed for Seattle and because of insufficient crew on board said vessel to man said vessel, was required to tie up in Lake Union at Seattle; that a fine was imposed upon the master of the TIMBER RUSH by the United States Customs for bringing said vessel from Tacoma to Seattle without a full crew, which fine was subsequently remitted; that on May 13, 1938, the seven (7) members of the crew involved in this action, not having returned to the ship at the time 'it sailed from Tacoma, and having been gone from said vessel since April 18, 1938, were each logged as deserters by the master of the vessel."

The court then found that the members of the crew who returned to the ship were paid off and furnished transportation and subsistence to New York; that the wages due appellant and his assignors were paid up to April 22d, and that the men received these wages under order of the United States district court; that these men never returned to the ship until after it was laid up in Lake Union, when they went on board and removed their personal belongings.

Findings Nos. 13 and 14 read as follows:

"(13) That the failure of the plaintiff and plaintiff's assignors to return to their vessel was due either to sympathy on their part with the picketing of the vessel, or a disinclination on their part to pass through a picket line, even though it was maintained by a rival or competing union organization; that the plaintiff and plaintiff's assignors after leaving the vessel did not thereafter intend to return to said vessel until the difficulties with the Sailors' Union of the Pacific had been adjusted and settled, and that by reason of the failure

of the plaintiff and plaintiff's assignors to return to the vessel the said vessel was compelled to lay up at Seattle.

"(14) That there was in this case no labor dispute between the defendant and the seamen employed by it, to-wit, plaintiff and plaintiff's assignors, but there was merely a jurisdictional dispute between two rival or competing labor organizations."

The court then concluded that appellant and his assignors had breached their contract; that they had received from respondent all sums due them; that they themselves were responsible for the abandonment of the voyage; that they were entitled to recover nothing from respondent; and that respondent was entitled to judgment dismissing the action. Judgment of dismissal was accordingly entered.

It appears that, during the past few years, a rider similar to that made a part of the shipping articles in the case at bar has been very generally used as a part of similar articles.

In defending the action, respondent relied upon three propositions: First, that appellant and his assignors had deserted the ship; second, that appellant and his assignors violated their contract, as embodied in the shipping articles; and third, that the voyage was canceled and the vessel laid up because of the fault of appellant and his assignors; respondent contending that for one or all of these reasons, appellant was not entitled to judgment. It is, of course, admitted that the men were paid in full up to April 22d.

We find it unnecessary to discuss the question of whether or not appellant and his assignors deserted the ship, and upon that question we express no opinion.

Appellant argues that under Rev. Stat., § 4596, 46 U. S. C. A., § 701, entitled "Offenses and Punishments," the men incurred no greater penalty than

forfeiture of two days pay. We are convinced that this section of the statute does not cover such a situation as is here presented.

 Appellant then argues that the men were justified in their refusal to return to the ship, contending that their refusal to avail themselves of the opportunity which was afforded them to return to the ship does not constitute such a breach of contract as deprives them of the benefit of their contract. Appellant argues that the men had reasonable grounds to apprehend physical danger should they return to the ship, calling attention to the fact that their return would have been under police protection.

In this connection, appellant cites the case of *Ward v. Ames*, 9 Johnson (N. Y.) 138, decided in 1812, in which it was held that a seaman who, during a voyage, left the ship on account of ill usage by the mate and the master, the man having been beaten by the mate, and who was in fear of further ill usage and impressment upon a British man-of-war, was not a deserter, but was entitled to recover full wages for the entire voyage. Appellant frankly states that this case is more nearly comparable to the case at bar than any other he has been able to find, but it is not in point here, as a seaman who has been beaten by one of the ship's officers, who, with the connivance of the master, had endeavored to have the man pressed for service upon a foreign war ship, certainly could not be required or expected to continue the voyage.

Respondent cites the case of *Scully v. The Great Republic*, 21 Fed. Cas. 895. The libelant shipped for a round trip voyage from California to Hongkong. During a call at Yokohama, the seaman went on shore and failed to return before the ship sailed. A month later, the ship again stopped at Yokohama, and the seaman sought to return, but the master refused permission.

It was held that the seaman was not entitled to recover his wages, having breached the contract of employment. In the course of the opinion, the court said:

"The effect of a failure on the part of the mariner to render himself on board the ship, in consequence of which she departs without him, is to discharge the master from the obligations of the contract, and this whether the failure be caused by vis major, or by the seaman's fault."

It was held that the seaman was not a deserter, and was entitled to wages earned up to the time he left the ship.

It has several times been held that a seaman who absents himself without leave and does not return to the ship by sailing time, under circumstances not amounting to desertion, may recover the amount of his wages actually earned, but is not entitled to wages for the balance of the voyage covered by the shipping articles. *Johnson v. Blanchard,* 7 Fed. 597; *Brink v. Lyons,* 18 Fed. 605; *McKinnon v. The Reed Case,* 39 Fed. 624.

In the case of *The Leiderhorn,* 99 Fed. 1001, it was held that the seaman was entitled to no recovery. In the case of *The Leiderhorn* and in the case of *McKinnon v. The Reed Case, supra,* the seaman absented himself as the result of a fight with another member of the crew on shipboard. In each case, it appeared that the master had requested the seaman to return, assuring him that he would suffer no further violence.

In *Buchanan v. United States,* 24 F. (2d) 528, it appeared that the ship called at a port in the Philippine Islands. Several members of the crew subsequently libeled the vessel for wages, it appearing that they intentionally overstayed their time on shore, believing that the ship would not sail without them. The ship, however, sailed at the appointed hour, hiring new sea-

men at another port. It was held that the men were not deserters, having had no intention of leaving the ship permanently, and were entitled to their earned wages. It was also held that their breach of contract precluded their recovery of anything save wages earned prior to the time the ship sailed.

In the matter of *The City of Norwich*, 279 Fed. 687, the rule is laid down that before a seaman may recover wages, it must appear

" . . . not only that there was a valid contract of employment, but that he has performed his contract until the voyage was completed, or his term of service expired, or show some legal and sufficient excuse for nonperformance."

In the case of *United States v. Smith*, 12 F. (2d) 265, involving a libel for wages, upon the ground that a demand for half wages had been wrongfully refused, and that for this reason the members of the crew were entitled to full wages, it was held by the circuit court of appeals, in reversing the district court, that the libelants were deserters and entitled to nothing. The district court had allowed recovery upon a theory not stated in the libel. In reversing the decree, the appellate court said:

"Recovery was had on a state of facts different from that relied on in the libel, namely, that the danger of violence at the hands of strikers excused libelants from performing their contract. It was not even suggested in the libel that there was any such danger. Aside from that, it is not claimed in the testimony that the crew would have been in any danger whatever if they had remained on board, nor that the ship was unable or unwilling to afford them full protection against violence."

In the case at bar, the findings of the trial court are supported by the evidence. Thirteen of the mem-

bers of the crew returned to the ship without molestation, and were not again disturbed in their work.

The shipping articles which constitute the contract between the parties bound the seamen who signed them to perform their full duty to the ship. If seamen landing from a vessel are involved in any altercation while on shore, whether based on purely personal grounds or any other not involving violation of law on their part, they are at all times entitled to the protection of the authorities to and on the ship, and unless they have reasonable grounds for anticipating violence while on the ship thereafter, they are not justified in abandoning the ship.

The contract between the parties is simple and does not require construction. It is only necessary to determine whether or not the facts shown in the particular case come within the terms of the rider.

In the case of *John Landro v. Pacific Atlantic S. S. Co.*, cause No. 13920, before the United States district court for the western district of Washington, northern division, Neterer, District Judge, filed an opinion November 27, 1937. The case is unreported, but the opinion is of record in the court files. From the opinion, it appears that the libelant and other members of the crew signed shipping articles on the ship "San Angelo" for a voyage from Seattle to Philadelphia and return. A rider somewhat similar to that here in question was made part of the shipping articles. Upon arrival of the ship at Philadelphia, the ship was picketed, apparently because the seamen's own union had declared a strike. The men then refused to work, and were paid off. Landro and several assignors claimed further compensation, but the district court concluded that there was nothing in the record showing that the crew left the ship for a reason for which they were not responsible, and that the vessel was not laid up, within

the provisions of the rider. As stated by Judge Neterer,

"The libelant and assignors may not enter into a relation or status and by their own acts bring about conditions violative of their engagement in the shipping articles."

In the case of *The San Angelo,* 1937 A. M. C. 1303 [U. S. Dist. Ct.], in which a rider similar to that contained in the articles in the case at bar was part of the articles, it appeared that a crew refused to work on board a vessel because the ship was picketed, with the result that the ship was tied up and the voyage abandoned. It was held that the seamen were entitled to no recovery.

We are convinced that appellant and his assignors had no legal excuse for refusing to return to the ship, and breached their contracts, and that the trial court correctly held that they are not entitled to recover in this action.

The cases of appellant Barfknecht and assignor Walter Anderson require some slight discussion. Anderson was not taken from the ship when the other members of the crew left on the 18th. He left the ship the following morning of his own volition, taking his personal effects with him. He was then taken to Seattle by the pickets. He returned to the dock at which the ship was tied up, April 22d, and talked to the captain, who told him to come back, but, as Anderson testified, "There were several pickets around there, and they were not in favor of it." On other occasions, Anderson came to the dock, but was told by the pickets not to go on board the ship, which instructions he obeyed. He had a hospital slip which he had obtained at some prior time, and May 13th he entered the Marine Hospital in Seattle, where he remained until June 2d. Appellant contends that, because Anderson was in

the hospital when the voyage was canceled, he is entitled to recover maintenance and wages to the end of the voyage, citing authorities. The cases cited do not support Anderson's contention in the case at bar. Anderson is no more entitled to recover than are his associates.

Appellant Barfknecht left the vessel voluntarily during the course of the evening of April 18th. When he tried to return to the ship that evening, he was stopped by the pickets, whereupon he went to Seattle. April 22d he returned to the dock and told the pickets he wanted to board the ship for the purpose of procuring a hospital certificate. This he obtained from the captain and returned to Seattle, but he at no time entered the hospital. He made no serious attempt to return to the ship, and clearly was guilty of a breach of contract. During most of the time after the men were taken to Seattle, there were no more than eight or ten pickets on the dock.

The findings made by the trial court are amply supported by the evidence. The court properly concluded from the findings that appellant and his assignors were not entitled to any recovery, and the judgment dismissing the action is accordingly affirmed.

BLAKE, C. J., STEINERT, GERAGHTY, and JEFFERS, JJ., concur.